**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Richard Dale Stokley,

        Petitioner,

vs.

Charles L. Ryan, et al.,[1]

        Respondents.

)
)
)
)
)
)
)
)
)
)
)

No. CV-98-332-TUC-FRZ

DEATH PENALTY CASE

**MEMORANDUM OF DECISION
AND ORDER**

     Richard Dale Stokley (Petitioner), a state prisoner under sentence of death, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he was convicted and sentenced in violation of the United States Constitution.  (Dkt. 1.)[2]  For the reasons set forth herein, the Court concludes that Petitioner is not entitled to habeas relief.

---

    [1]     Charles L. Ryan is substituted for Dora B. Schriro, as Acting Director, Arizona Department of Corrections. Fed. R. Civ. P. 25(d)(1).

    [2]     "Dkt." refers to documents in this Court's file. As is customary in this District, the Arizona Supreme Court provided to this Court the original trial and sentencing transcripts, as well as certified copies of the various state court records. (Dkt. 68.) The Court will utilize the following designations for these materials:  "ROA I" refers to the six-volume record on appeal prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-92-278-AP); "ROA II" refers to the two-volume record on appeal prepared for Petitioner's petition for review of the denial of post-conviction relief (Case No. CR-97-287-PC); "ROA III" refers to the one-volume record on appeal prepared as a supplemental record for Petitioner's petition for review (Case No. CR-97-287-PC); "RT" refers to the court reporter's transcript.

**PROCEDURAL BACKGROUND**

In 1992, Petitioner was convicted by a jury of two counts of kidnapping, one count of sexual conduct with a minor under the age of fifteen, and two counts of premeditated first degree murder arising from the deaths of two thirteen-year-old girls in a remote area in southeast Arizona.[3] Cochise County Superior Court Judge Matthew W. Borowiec sentenced Petitioner to death for the murders and to various prison terms for the other counts. On direct appeal, the Arizona Supreme Court affirmed. *State v. Stokley*, 182 Ariz. 505, 898 P.2d 454 (1995).

Following an unsuccessful petition for certiorari to the United States Supreme Court, *Stokley v. Arizona*, 516 U.S. 1078 (1996), Petitioner filed a petition for post-conviction relief (PCR) pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. The petition, prepared by court-appointed counsel Harriett Levitt, raised two claims. Two months later, the PCR court summarily denied relief. Subsequently, Petitioner sought special action relief in the Arizona Supreme Court due to a dispute concerning Levitt's continued appointment as counsel. In June 1997, the Arizona Supreme Court denied Petitioner's request to terminate Levitt's appointment but directed Levitt to file a supplemental PCR petition. That petition, raising six additional claims, was filed in October 1997, and denied by the PCR court in February 1998. On June 25, 1998, the Arizona Supreme Court summarily denied review of the PCR court's rulings.

Petitioner filed a Petition for Writ of Habeas Corpus in this Court on July 14, 1998. He subsequently filed an amended petition and a second amended petition. (Dkts. 20, 33.) Respondents filed an answer, limited by the Court's order to issues of exhaustion and procedural default. (Dkt. 44.) Procedural briefing concluded in April 2000, after Petitioner filed a traverse, Respondents filed a reply, and Petitioner filed a sur-reply. (Dkts. 49, 59,

---

[3]     Petitioner's case was severed from that of his twenty-year-old co-defendant, Randy Brazeal, who pled guilty and was sentenced to twenty years in prison. (ROA I at 187.) Brazeal refused to testify at Petitioner's trial. (RT 3/25/92 at 25.)

1    64.)[4]

2         In an order filed August 31, 2006, the Court dismissed with prejudice fifteen claims as

3    procedurally defaulted or plainly meritless.  (Dkt. 70 at 8-9, 36-37.)  The Court directed

4    merits briefing on Petitioner's remaining claims, Claims A-1, C, E, and G (*id.* at 37), which

5    was completed in March 2007 (Dkts. 83, 87, 90).  In his opening merits brief, Petitioner

6    concedes as to Claims C, E, and G that he "has not been able to locate any authority as

7    required by 28 U.S.C. § 2254(d), which would hold that the state court's determination of

8    [these] claim[s] was contrary to or an unreasonable application of a decision by the Supreme

9    Court of the United States."  (Dkt. 83 at 39.)  Accordingly, these claims are summarily

10   denied, and this order addresses the only remaining claim, A-1, which alleges ineffective

11   assistance of counsel (IAC) at sentencing.

12                                    **DISCUSSION**

13        Petitioner was represented at trial by Robert Arentz and G. Philip Maxey, and at

14   sentencing by Arentz and Jeffrey Siirtola.[5]  Petitioner argues that counsel provided

16        [4]      While the procedural status of Petitioner's claims was under advisement, the

17   Ninth Circuit Court of Appeals issued a decision in *Smith v. Stewart*, 241 F.3d 1191 (9th Cir.
     2001), which called into question Arizona's doctrine of procedural default.  Due to the

18   practice of bifurcating the briefing of procedural and merits issues then employed by the

19   District of Arizona in capital habeas cases, the Court, in the interest of judicial economy,
     deferred ruling on the procedural status of Petitioner's claims pending further review of

20   *Smith*. (Dkt. 69.)  In June 2002, the United States Supreme Court reversed the Ninth Circuit.

21   *Stewart v. Smith*, 536 U.S. 856 (2002) (per curiam).  Contemporaneously, the Court decided

22   *Ring v. Arizona*, 536 U.S. 584 (2002), which found part of Arizona's judge-sentencing
     scheme unconstitutional.  The Court continued to defer ruling in this matter pending a

23   determination of whether *Ring* applied retroactively to cases on collateral review.  In June

24   2004, the Supreme Court held that *Ring* was not retroactive.  *Schriro v. Summerlin*, 542 U.S.
     348 (2004).

25        [5]      At the time of their appointment, Arentz served as the Cochise County Public

26   Defender and Maxey was a deputy public defender.  By the time of trial, Arentz had

27   transitioned into private practice and Maxey had become the Cochise County Legal
     Defender, a separate indigent defense agency.  (ROA I at 489, 497-98.)  Following

28   Petitioner's conviction, Maxey withdrew as counsel and Deputy Public Defender Siirtola was

1  constitutionally deficient representation at sentencing by failing to adequately investigate

2  Petitioner's mental state at the time of the crime. (Dkt. 33 at 19-31.) Specifically, Petitioner

3  faults counsel's failure to obtain a neuropsychological exam after a neurologist determined

4  that Petitioner had organic brain damage. (*Id.* at 23.)

5  **I.    Factual Background**

6         A.    Offense

7         The Arizona Supreme Court summarized the pertinent facts surrounding the crimes for

8  which Petitioner was convicted:

9              On the Fourth of July weekend, 1991, two thirteen year old girls, Mary and
              Mandy, attended a community celebration near Elfrida, Arizona. The thirty-eight
10             year old defendant also attended the festival to work as a stuntman in Old West
              reenactments.

11
              Mary and Mandy, along with numerous other local children, camped out at
12            the celebration site on July 7. That night co-defendant Randy Brazeal, age twenty,
              showed up at the campsite. Brazeal had previously dated Mandy's older sister and
13            knew Mandy. During the evening, Brazeal approached the girls' tent and had a
              discussion with Mary and Mandy. The girls were also seen standing next to
14            Brazeal's car speaking to Brazeal, who was in the driver's seat, while defendant
              was in the passenger seat. Around 1:00 a.m. on July 8, 1991, the girls told a friend
15            they were going to the restroom. They never returned.

16            The next day Brazeal surrendered himself and his car to police in Chandler,
              Arizona. The hood of the car had semen stains, as well as dents matching the
17            shape of human buttocks. Palm prints on the hood matched Brazeal. The back
              seat had semen stains matching defendant and also had blood stains. Police found
18            a bloody pair of men's pants in the car.

19            Meanwhile, defendant called a woman in Elfrida asking her to send someone
              to pick him up in Benson, Arizona. The woman asked about the missing girls, to
20            which defendant replied, "What girls? I don't know anything about any girls."
              Police arrested defendant that same day at a Benson truck stop. Police found
21            blood stains on his shoes, and his pants looked as if they had recently been cut off
              at the knee.

22
              After reading defendant his *Miranda* rights, police questioned defendant at
23            the Benson police station. At first he denied any knowledge of the girls, but after
              hearing about Brazeal's arrest and being asked about "a particular mine shaft
24            around Gleason," he admitted that he and Brazeal had sexually assaulted the girls.
              He admitted having sex with "the brown haired girl" (Mandy) and stated that
25            Brazeal had sex with both of them. He also said he and Brazeal had discussed
              killing the girls, after which defendant choked one and Brazeal strangled the other.
26            He admitted, "I . . . choked 'em. . . . There was one foot moving though I knew

27    _____

28    appointed to serve as co-counsel.

they was brain dead but I was getting scared. . . . They just wouldn't quit. It was terrible." Defendant also admitted using his knife on both girls. After killing the girls, they dumped the bodies down a mine shaft.

Defendant led the police to the abandoned mine shaft and expressed hope that the trial would not take long so he could "get the needle and get it over with." After explaining how they had moved timbers covering the shaft to dump the bodies, he pointed out where he and Brazeal had burned the girls' clothes.

Police recovered the nude bodies from the muddy mine shaft. Autopsies showed that both girls had been sexually assaulted, strangled (the cause of death), and stabbed in the right eye. The strangulation marks showed repeated efforts to kill, as the grip was relaxed and then tightened again. Both victims suffered internal and external injuries to their necks. Mandy also had stomp marks on her body that matched the soles of defendant's shoes. Evidence was consistent with each victim being killed by a different perpetrator. In particular, Mary's body had a mark on the neck consistent with Brazeal's boot, whereas bruise marks on Mandy matched the soles of defendant's shoes. And more force was used in strangling Mandy than Mary. DNA analysis indicated that both defendants had intercourse with Mandy. Mary's body cavities were filled with mud, making DNA analysis impossible.

*Stokley*, 182 Ariz. at 512-13, 898 P.2d at 461-62 (footnote omitted).

In his statement to police, Petitioner said he had not had a bath in about a week and had asked Brazeal to take him to a stock tank where he could clean up. (Dkt. 61, Ex. F at 7.) While en route, they saw the girls walking down the road and picked them up. (*Id.* at 12.) Petitioner further stated that Brazeal drove away with the girls after dropping Petitioner at the tank. When he found them nearby after taking his bath Brazeal told him the girls had to be killed because he had sex with them. (*Id.* at 7.) He also claimed that the evening did not start out as something bad, that he had been drinking heavily and was very drunk, and that it was Brazeal's idea to assault the girls. (*Id.* at 8.)

B.   Relevant Pretrial Proceedings

Prior to trial, defense counsel sought the appointment of psychologist Larry Morris to evaluate Petitioner's mental condition at the time of the offense in order to determine the viability of an insanity defense and for mitigation at sentencing. (ROA I at 214-19.) In support of the motion, counsel detailed Petitioner's "long history of psychological problems," including abandonment by his parents, long-term drug and alcohol abuse, depression, and suicide attempts. (*Id.* at 218-19.) Counsel also sought the appointment of neuropsychologist John Barbour to determine whether two significant head injuries and long-term alcohol and

1   drug use had damaged Petitioner's brain, affecting his motor skills and behavior. (*Id.* at 223-

2   26.)  Counsel attached to the motion hospital records documenting that in 1982 Petitioner

3   was hit with a beer mug, causing a skull fracture.  (*Id.* at 228.)  In both motions, counsel

4   referenced the fact that significant impairment of a defendant's capacity to appreciate the

5   wrongfulness of his conduct or to conform his conduct to the requirements of the law at the

6   time of the crime constitutes a mitigating factor.  *See* A.R.S. § 13-703(G)(1).

7       In a supplemental filing, defense counsel couched his request for experts as necessary

8   to determine whether Petitioner was competent to assist counsel in preparation for trial.

9   (ROA I at 245-55.)  The motion provided additional detail regarding Petitioner's background,

10  including his hospitalization for suicidal ideation in 1978.  (*Id.* at 249-50.)  Counsel noted

11  that the hospital report stated that Petitioner:

12      had a previous hospitalization in 1971 for the same reason.  The patient history
        indicates several suicide attempts and a history of chronic drug abuse.  The MMPI
13      was consistent with a diagnosis of psychotic depression.  The final diagnosis was
        personality disorder with differential to include passive-aggressive personality,
14      antisocial personality and a borderline personality.

15  (*Id.*)  Additionally, Petitioner reported at least five suicide attempts since 1978:  in 1979, a

16  drug overdose; a deliberate automobile accident in 1980; two attempts with handguns; and,

17  in 1983, Petitioner strapped dynamite around himself.  (*Id.* at 250.)  Counsel appended a copy

18  of the 1978 hospital record, which, in addition to describing Petitioner's suicide attempts and

19  drug use, listed as pertinent features of Petitioner's history an unstable childhood, inability

20  to develop close personal relationships, and inability to keep a job for any length of time.

21  (*Id.* at 255.)

22      At a September 1991 pretrial hearing, the court granted both motions and directed

23  counsel to prepare orders of transport for Petitioner's psychological and neuropsychological

24  examinations.  (RT 9/12/91 at 14.)  When the court questioned whether the defense would

25  be using a medical doctor to assess brain damage, counsel explained that he did not yet know

26  which expert was available but the person would be a neuropsychologist, not a neurologist,

27  because "studies have shown this [neuropsychological] kind of examination is much more

28  sophisticated and can pick up things the CAT scan cannot."  (*Id.* at 15.)  Approximately one

month later, the court signed orders directing that Petitioner be transported to the offices of psychologist Larry Morris and neuropsychologist John Barbour for examinations.  (ROA I at 434, 437.)  The court subsequently ordered that Petitioner again be transported to Dr. Barbour's office for further evaluation.  (*Id.* at 445.)

    C.   <u>Presentence Proceedings</u>

Following his conviction, Petitioner identified the following mitigating factors he intended to assert at the aggravation/mitigation hearing:

1)    The Defendant's lack of any prior felony record.

2)    The Defendant's cooperation with law enforcement.

3)    Unequal sentence given to Co-defendant.

4)    Failure of the State, by its agent, the Cochise County Attorney's Office, to establish guidelines to determine under what circumstances the death penalty will be sought.  Such guidelines are necessary for a determination of the proportionality of the imposition of the death sentence.

5)    Alcohol abuse and intoxication.

6)    Ability to be rehabilitated.

7)    Difficulty in early years and prior home life.

8)    Good behavior while incarcerated.

9)    Mental condition and behavior disorders.

10)    Cruelty of the manner of execution.

11)    Lack of future dangerousness if confined to prison.

12)    General good character of the Defendant.

13)    Mercy in sentencing.

14)    Any other aspect of the Defendant's character, propensities or record, and any of the circumstances of the offense relevant to sentencing.

(ROA I at 1081-84 (citations omitted).)  In a separate memorandum, Petitioner expanded on these factors, especially the disparate sentence for co-defendant Brazeal.  (*Id.* at 1101-03.)

    1.   Presentence report

At a conference prior to the presentence hearing, the court agreed that it would not read the probation department presentence report but would consider an alternative presentence

report prepared by Petitioner's sentencing expert, John J. Sloss.  (RT 6/15/92 at 7; RT 6/17/92 at 141-42.)  Sloss, a former corrections counselor and former member of the Arizona Board of Pardons and Parole, interviewed Petitioner, his defense team, and various friends and family members, and reviewed documents pertaining to Petitioner.  (ROA I at 497; Dkt. 61, Ex. G at 1, 12.)  Petitioner expressed remorse to Sloss and "repeatedly stated that [the crimes] would have never happened had he not been drinking."  (Dkt. 61, Ex. G at 1.) Sloss's report included a detailed social history of Petitioner, to which Sloss also testified at the presentence hearing.  (*Id.* at 3-7; RT 6/17/92 at 74-145.)

Sloss appended to his report an evaluation by Dr. Huntley Hoffman, a psychologist who had evaluated Petitioner in June 1991, approximately two weeks prior to the murders.  (Dkt. 61, Ex. G at Hoffman Rpt.)  Dr. Hoffman had been asked by the Disability Determination Service Administration to assess Petitioner's allegations of brain injury.  Dr. Hoffman's intelligence testing indicated that Petitioner had a full-scale IQ of 128, in the "superior" range.  (*Id.*)  Results of organicity testing (Wechsler Memory Scale and Trailmaking) indicated mild to moderate memory deficit but did not indicate brain damage.[6]  (*Id.*)  Dr. Hoffman opined that Petitioner intellectually "could probably perform any job he is qualified to do."  (*Id.*)  However, "[e]motionally, chronic pain, hostility, and possibly a mood disorder, could impair his relationships with co-workers and the public.  These symptoms could also limit concentration/attention (no concentration/attention impairment was noted during the test/interview)."  (*Id.*)

Dr. Hoffman's diagnostic impression was as follows:

> Richard has "superior" intelligence.  There were no indications of right brain damage.  Immediate and remote left brain memory was intact.  Generally, short and long term left brain memory seemed unimpaired by MSE, but Wechsler Memory Scale results indicated a mild to moderate deficit.

---

[6]     Dr. Hoffman is identified as a psychologist, not a neuropsychologist, in the report.  However, one of Petitioner's habeas experts states that the Trailmaking Test administered by Dr. Hoffman is a neuropsychological screening test. (Dkt. 49, Ex. 1 at 4-5.)

> Richard's history is significant for drug abuse. He currently demonstrates many characteristics of alcoholism. Mood disorder needs to be ruled out. Richard describes poly physical impairments that could limit vocational potential.

(*Id.*)  In an addendum dated August 28, 1991, Dr. Hoffman diagnosed Petitioner with alcohol dependence. However, "[e]ven though Richard demonstrated some 'soft signs' of short/long term memory impairment, it does not appear significant enough to warrant a DSM-III-R diagnosis." (*Id.*)  He further stated that depressive disorder not otherwise specified and organic personality disorder not otherwise specified needed to be ruled out and noted Petitioner's "significant history for polysubstance abuse – in full remission since 1980." (*Id.*)

2.   Presentence hearing

The trial court held a four-day presentence aggravation/mitigation hearing in June 1992. The prosecution presented the testimony of the medical examiner, who described the victims' manner of death for the purpose of proving the "heinous, cruel or depraved" aggravating factor.  (RT 6/16/92 at 6-75.)  The defense presented the testimony of numerous lay and expert witnesses to establish its proffered mitigating factors.[7]

*Social History Witnesses*

Two of Petitioner's aunts, Mabel Gentry and Zelma Brause, and his younger half-sister, Barbara Thompson, testified about Petitioner's childhood. (RT 6/16/92 at 76-115; Dkt. 97, Thompson Dep.; Dkt. 97, Brause Dep.)  Petitioner was born in San Antonio to a seventeen-year-old mother; he never met his father, whom his mother hardly knew. (RT 6/16/92 at 79, 81-82; Dkt. 97, Brause Dep. at 10, 19.)  Thompson testified that Petitioner loved his mother but resented the loss of a "normal" home life when she divorced his stepfather, and that their mother struggled to work and raise two children. (Dkt. 97, Thompson Dep. at 8, 17.) Petitioner was close to his grandparents and spent much of his time living at their house. (RT 6/16/92 at 83; Dkt. 97, Thompson Dep. at 6, 12; Dkt. 97, Brause Dep. at 7.)  He also lived with his aunt and uncle, the Gentrys, for approximately six months as a newborn and again

---

[7]   Testimony from eight of Petitioner's lay witnesses was presented to the court via deposition transcripts, which were read during the presentence hearing.  (RT 6/16/92 at 123-26; RT 6/17/92 at 2-3.)

in Arizona for about two years beginning when he was fourteen (RT 6/16/92 at 82); Brause testified that Homer Gentry was very strict (Dkt. 97, Brause Dep. at 9).  The relatives testified that Petitioner's grandparents and his mother loved him very much.  (RT 6/16/92 at 108-09; Dkt. 97, Brause Dep. at 7, 10.)  They all noted that Petitioner was a caring person, was helpful and had shown compassion for family members, and at age eighteen married a woman to help care for her children.  (RT 6/16/92 at 87-88,104; Dkt. 97, Thompson Dep. at 19-20; Dkt. 97, Brause Dep. at 14.)

Robert E. Lee Parrish and his wife, who knew Petitioner as a teenager, testified that he was always respectful of women, never used vulgar language, was not a violent person, and could hold his liquor very well. (Dkt. 97, R. Parrish Dep. at 5, 6-8, I. Parrish Dep. at 6-7.) Newt Maxwell, an occasional employer of Petitioner as a teenager, and his wife stated that Petitioner was non-violent even when drinking.  (Dkt. 97, N. Maxwell Dep. at 5, 7-8, R. Maxwell Dep. at 6.)  Petitioner's long-time friend Walter Donahue and his wife testified that Petitioner was a hard worker who drank but was never violent.  (Dkt. 97, W. Donahue Dep. at 4-5, 6, P. Donahue Dep. at 6.)  Mrs. Donahue discussed Petitioner's periodic attempts to quit drinking and stated that he was "always helpful."  (Dkt. 97, P. Donahue Dep. at 6, 12.) They both stated that Petitioner was invaluable when their son suffered serious burns.  (*Id.* at 8-10; Dkt. 97, W. Donahue Dep. at 7-9.)

*Sentencing Expert*

Petitioner's sentencing expert, John Sloss, also testified at the hearing.  (RT 6/17/92 at 74-145.)  He relayed that Petitioner dropped out of school in the tenth grade and later obtained a GED; he believed Petitioner had the capability of performing well but was not motivated to do so because of the turmoil of frequently changing schools, not knowing his father, and having a mother who was too busy to spend time with him.  (*Id.* at 84-86, 105.) Petitioner enlisted in the Army but was honorably discharged due to knee problems.  (*Id.* at 86.)  Sloss described Petitioner's four unsuccessful marriages.  (*Id.* at 87-90.)  Petitioner's work history consisted of only short-term, laborer-type positions, which Sloss surmised was attributable to Petitioner's alcoholism.  (*Id.* at 90-91.)  Finally, Sloss opined that Petitioner

- 10 -

1   was willing to participate in a substance abuse program, was motivated to lead a meaningful

2   life in prison, and should be sentenced to consecutive life sentences in lieu of the death

3   penalty. (*Id.* at 107, 111.)

4       *Neurological Expert*

5       Michael Mayron, M.D., performed a neurological examination of Petitioner on March

6   6, 1992, one week before the start of trial, and testified at the presentence hearing. (ROA I

7   at 1087-89; RT 6/17/92 at 9.)  According to Dr. Mayron, Petitioner's history and records

8   revealed that he:

> has suffered multiple head injuries throughout his life.  His first reported head injury was at the age of 3 when the patient was playing with his grandfather and tripped on the sidewalk, striking his skull on the concrete.  His grandmother reported to him that he suffered a skull fracture but it is unclear as to the veracity of this.  He was then in multiple altercations as a teenager with head injuries occurring in many of these fights.  The first very severe head injury that we have documented, though, is in March 04, 1982, when he was struck with a beer mug creating a left parietal compound depressed skull fracture with left parietal lobe contusion.  [In] July of 1986 he suffered head injury when trying to get into a moving vehicle.  He was reported in the hospital records to have a transient right hemiparesis with left forehea[d] laceration.  Approximately 1 and ½ years ago the patient suffered head injury from his last wife when struck with a very heavy cast iron frying pan resulting in loss of consciousness.
>
> The patient also provides history that in 1980 [he was] attacked by a gang wherein he was struck with multiple objects with the last one he recalls being struck with a car bumper jack to the frontal area.  He was left unconscious on the street and taken in by some people and recovered on his own in another person's home over a period of months.  He states that he noticed a change in his temperament after this 1980 head injury.  He has always had a difficult temper but his temper was more quickly triggered after the 1980 head injury and was much more difficult to control.  He also states that his memory was very bad for recent events.
>
> The patient is a self admitted alcoholic drinking at least a pint of whiskey a day since adolescence.  He also claims to have heavily used marijuana, LSD, mescaline, peyote, psilocybin, heroin, cocaine, crack and methamphetamine.

23  (ROA I at 1087-88.)

24      Dr. Mayron's physical examination of Petitioner revealed Petitioner to be alert,

25  oriented, and cooperative. (*Id.* at 1088.) Examination of Petitioner's cranial nerves showed

26  them to be completely intact.  (*Id.*)  However, motor, sensory, and reflex examinations

27  revealed some deficits and impairments.  (*Id.*)  In his report, Dr. Mayron recorded the

28  following impression of Petitioner:

- 11 -

[h]istory of multiple head injuries with a left depressed skull fracture 2 years after at least a frontal injury from a car jack with the former resulting in a permanent mild right hemiparesis and hemisensory deficit and the former appears to be a permanent post-concussion syndrome memory impairment and disturbance characterized with increased difficulty with impulse control.  This would have been worsened by the 1982 head injury that resulted in his right sided deficits.

(*Id.* at 1089.)

At the presentence hearing, Dr. Mayron reiterated his opinion that the 1982 "beer mug" incident caused a severe injury to the left side of Petitioner's brain – specifically, his parietal lobe –  resulting in permanent weakness to the right side of his body.  (RT 6/17/92 at 11-12, 14.)   In addition, this and other injuries could have impacted Petitioner's ability to understand, interpret, and respond to his environment, resulting in, among other things, a decreased control of impulsive behavior.  (*Id.* at 12, 19.)  Dr. Mayron opined that Petitioner's "brain integrity," or anatomic function, was moderately to severely impaired due to previous head injuries, causing impulsive and emotional behavior, irritability, depression, and impaired ability to make good judgments and to plan ahead.  (*Id.* at 33-34, 70-74.) According to Dr. Mayron, "anatomic damage to the brain is almost invariably almost [sic] incapacitating."  (*Id.* at 72.)

Dr. Mayron indicated that long-term drug and alcohol abuse could exacerbate such head injuries by continuing to destroy brain tissue.  (*Id.* at 21.)  Further, alcohol's disinhibition of brain function would have a cumulative effect on behavior, so that it would take less alcohol to achieve loss of control of emotions in an individual with brain damage and would exacerbate difficulty with cognitive ability.  (*Id.* at 34-35.)

Dr. Mayron further testified that a person with depression and a personality disorder develops coping mechanisms to adapt to life.  (*Id.* at 37.)  A head injury will disturb these mechanisms, magnify the person's misperceptions, and cause the depression to worsen.  (*Id.* at 38-39.)  However, Dr. Mayron conceded that Petitioner may have developed other coping mechanisms in the ten years between the injury and the offenses, as evidenced by his lack of any serious criminal record.  (*Id.* at 72-73.)

On cross-examination, Dr. Mayron explained that during a neurological evaluation

behavioral changes are assessed "through observation of the patient in the exam room with you or by referral to a psychologist or a neuropsychologist, someone who is trained in doing testing of brain function, which includes behavior." (*Id.* at 65.)  While examining Petitioner, Dr. Mayron did not see anything that indicated behavioral problems resulting from Petitioner's parietal injury and was not asked to refer him to somebody for behavioral testing. (*Id.* at 65-66.)  He further stated that such testing would ordinarily include tests such as the MMPI (Minnesota Multiphasic Personality Inventory).  (*Id.* at 66.)

*Psychological Expert*

At the request of defense counsel, Dr. Larry Morris examined Petitioner prior to trial pursuant to Rule 11.2 of the Arizona Rules of Criminal Procedure.  (RT 9/12/91 at 14.)  He prepared a report and testified at the presentence hearing.  (Dkt. 61, Ex. G at Morris Rpt.; RT 6/18/92 at 2-71.)  In addition to interviewing Petitioner, Dr. Morris administered a battery of tests and reviewed numerous collateral documents, including an MMPI-2 administered by John Barbour, Ph.D., on November 6, 1991.  (Dkt. 61, Ex. G at Morris Rpt.)

Petitioner reported to Dr. Morris "[r]ather chaotic childhood experiences, including abuse, neglect and hyperreligiousity."  (*Id.*)  Petitioner related that his grandmother "was a hell-fire and brimstone preacher," and his grandfather was a "mean man who carried a Forty-Five." (*Id.*)  When Petitioner was eleven his mother and stepfather divorced, and they moved into low-income housing.  Petitioner reported that his mother had "no time" for him, and he moved back and forth between her and his nearby grandmother.  At the age of fourteen, when Petitioner began experiencing social problems at school and had continuing difficulties with his mother, he was sent to live with his aunt and uncle in Arizona.  According to Petitioner, his uncle was an alcoholic and physically abusive.  When he was fifteen years old, after a "confrontation" with his uncle, Petitioner was sent back to Texas, where he continued to experience social and academic problems at school, leading to two expulsions.

Dr. Morris recounted Petitioner's Army discharge, his employment history, consisting of brief stints in unskilled positions, his record of underachievement as a student, and the fact that he had been divorced four times.  (*Id.*)  According to Petitioner, he had "rather severe

interpersonal relationship problems with each of his spouses and/or family members." (*Id.*) Petitioner reported adultery by his second wife, domestic violence from his fourth, and that one wife had an abortion without his consent. (*Id.*)

Dr. Morris also noted Petitioner's drug use:

> As a youngster Mr. Stokley began to experiment with alcohol and marijuana. At age 15 years he was abusing alcohol and within a few years he was abusing LSD and other hallucinogens. In his 30s Mr. Stokley "got to doing crack and got a $200 to $300 habit." When he began to experience physical problems and bouts with paranoia Mr. Stokley "decided to quit and I flushed $2,000 worth of drugs down the toilet." He continued to abuse alcohol, however, and he reported drinking "to get drunk." While abusing alcohol and other substances he, at times, "hears people telling me bad things, telling me to do bad things." He described the voices as male. Mr. Stokley also reported experiencing "memory losses" for some activities while intoxicated.

(*Id.*)

Petitioner's reported psychological problems included suicidal ideation and suicide attempts resulting in hospitalization. Petitioner stated that "he has not been successful in life and does not like the way people, especially women, treat him." (*Id.*) Petitioner's performance on the Attitude Toward Women Scale indicated that he "holds more traditional or conservative rather than egalitarian attitudes toward women." (*Id.*) Petitioner's responses to the Buss-Durkee Hostility Inventory suggested "an above average level of anger and hostility, especially in the areas of suspiciousness and resentment." (*Id.*) Petitioner's responses to the Burt Rape Acceptance Scale suggested "an above average acceptance of rape myths," which has a correlation to "sexually assaultive males." (*Id.*)

Dr. Morris's report concluded:

> This evaluation revealed a 38-year-old man with a childhood history of abuse and neglect. While he appears to have above average intelligence he also has a history of underachievement. He drifted into abusing alcohol and other drugs at an early age and continued abusing alcohol until the present incarceration. While Mr. Stokley has managed, for the most part, to support himself by securing legitimate employment, he exhibits a pattern of vocational instability characterized by numerous but relatively short-term employment experiences.

> Mr. Stokley does not appear to be suffering from a psychotic disorder but he has a history of depression and other serious psychological problems. By his own admission he experiences "lots of anger" and his primary coping mechanism is numbing himself through substance abuse. He displays very poor interpersonal relationship skills and relationships tend to be stressful, troubled and unsatisfying.

Mr. Stokley also appears to experience difficulties with impulse control and poor judgment. In this regard, he tends not to study consequences well but responds impulsively instead. This pattern of impulsivity has its roots in childhood and has, unfortunately, become an integral part of Mr. Stokley's personality structure. In legal parlance, he appears to be a reactive rather than reflective type individual. Diagnoses of depression, polysubstance abuse, and borderline personality disorder should be considered.

Although Mr. Stokley appears a seriously dysfunctional individual, it is my opinion that he is competent to stand trial and could participate meaningfully with his attorney in his own behalf.

(*Id.*) With respect to Petitioner's state of mind at the time of the crime, Dr. Morris reported:

When asked to describe his thinking processes during the instant offense, Mr. Stokley stated that he had no clear memory of events associated with the death of the two girls. He reported some details of events leading to contact with the girls and Mr. Randy Brazeal and then being in a car north of Tucson with Mr. Brazeal several hours subsequent to the instant offense. Since he was unable to discuss the details of the offense itself, it was not possible to evaluate his state of mind during the time the two girls were murdered. Since Mr. Stokley reported consuming alcohol prior to the instant offense it appears likely, however, that he was intoxicated during this time period.

(*Id.*) Finally, Dr. Morris suggested that "[d]ue to Mr. Stokley's history of head injuries the possibility of an organic disorder should be addressed by a neuropsychologist and/or neurologist experienced in these matters." (*Id.*)

At the presentence hearing, Dr. Morris reiterated much of the information in his report and expanded on some areas. He testified that "abusive and chaotic [childhood] experiences formulated the kind of marginal personality that we see in Mr. Stokley and that the significant dysfunction he experienced is a function of those childhood experiences." (RT 6/18/92 at 15.) Dr. Morris opined that Petitioner "is an individual who probably doesn't study things very carefully, although he is extremely bright, and figure[s] things out before he acts. He acts and worries about it later." (*Id.* at 25.) Dr. Morris emphasized that Petitioner has trouble controlling his emotions and that stress and alcohol exacerbate problems with impulse control and poor judgment. (*Id.* at 28-29.)

Dr. Morris described borderline personality disorder, testifying that it is "between what we would consider normal personality development and an individual who is psychotic." (*Id.* at 31.) Individuals with the disorder "may have a personality but it's very unstable." (*Id.*) They may experience mood changes in which they are "depressed one minute, and the next

1   minute could be so angry, they could tear the building down and you don't know why." (*Id.*

2   at 32.)  Individuals with a borderline personality cannot adapt well to what is going on

3   around them.  (*Id.*)  They are impulsive and have difficulty with anger management.  (*Id.* at

4   33.) Petitioner's "model" behavior in prison is not inconsistent with Dr. Morris's assessment

5   that he is a "seriously dysfunctional individual" with borderline personality disorder because

6   "some kind of stability . . . could occur in a structured prison setting."  (*Id.* at 56-57.)

7       On cross-examination, Dr. Morris stated that Petitioner was not legally insane at the

8   time of the murders and that someone with borderline personality disorder would recognize

9   the wrongfulness of his conduct.  (*Id.* at 45.)  However, Petitioner's impulsivity makes it

10  difficult for him to conform his behavior to the law.  (*Id.* at 65.)  Dr. Morris testified that, on

11  the basis of his history and apparent level of intoxication, Petitioner's capacity to appreciate

12  the wrongfulness of his conduct was significantly impaired at the time of the crime.  (*Id.*)

13  Dr. Morris conceded that his opinion about Petitioner's mental state at the time of the crime

14  was based on the pattern of borderline personality disorder, not on any specific facts

15  provided by Petitioner.  (*Id.* at 69.)  Although alcohol could exacerbate problems with

16  impulsivity in a "volatile situation" involving teenaged girls, Petitioner's personality disorder

17  also could have had nothing to do with triggering Petitioner's actions at the time of the

18  offense.  (*Id.* at 69-71.)

19      According to Dr. Morris, the likelihood of a person with a borderline personality

20  "automatically" killing at another's direction would depend on the person's state of mind;

21  anger and frustration would tend to make it more likely.  (*Id.* at 46-48.)  Dr. Morris testified

22  that Petitioner's shoeprint on one of the victims and stab wounds to both victims' eyes would

23  be consistent with intense anger.  (*Id.* at 48-49.)  He acknowledged that killing to eliminate

24  witnesses and destroying evidence to cover up a crime would demonstrate more

25  thoughtfulness and less impulsivity.  (*Id.* at 54-55.)  Dr. Morris further testified that

26  Petitioner demonstrated some features or symptoms of antisocial personality disorder, in

27  which one is more consciously breaking the law.  (*Id.* at 66-67.)

28      *Rebuttal Witnesses*

- 16 -

1     In rebuttal to Petitioner's mitigation presentation, the prosecution called several

2    witnesses. Deborah Chadwick testified that she was married to Petitioner for about seven

3    months in 1986. (*Id.* at 73.) She stated that Petitioner was physically abusive on numerous

4    occasions, including one incident in which he threatened to kill her and throw her body in

5    a mine shaft. (*Id.* at 74-77.) Another time, Petitioner grabbed her around the neck and

6    strangled her. (*Id.* at 81.) She denied getting an abortion without Petitioner's knowledge and

7    testified that he drove her to and from a clinic for the procedure. (*Id.* at 82.) Another ex-

8    wife, Candace Fuller, testified that she was married to Petitioner for seven months in 1991,

9    but only lived with him for the first two because he became physically abusive. (*Id.* at 89-

10    91.) During one beating, Petitioner told her he was going to finish her off and put her in a

11    mine shaft. (*Id.* at 103.)

12     Finally, Homer Gentry, Petitioner's uncle, testified about the months when as a teenager

13    Petitioner lived with him and his wife in Arizona. (*Id.* at 114-30.) He denied sending

14    Petitioner back to Texas after a fight, stating that he had told Petitioner from the start that

15    Petitioner was free to go back home if he ever became dissatisfied living with them. (*Id.* at

16    115-17.) He denied being an alcoholic but acknowledged whipping Petitioner on occasion,

17    including once with a rope for causing damage to a young tree. (*Id.* at 122-27.)

18    *Closing Argument*

19     Defense counsel Arentz gave a lengthy closing argument, urging the sentencing judge

20    to find that the proffered mitigating evidence was sufficiently substantial to call for leniency.

21    (RT 6/19/92 at 3-44.) He reminded the court of the necessity to conduct an individualized

22    sentencing and to consider Petitioner's entire life in assessing whether the death penalty was

23    appropriate. (*Id.* at 4, 12.) Counsel urged the court to consider that Petitioner had no prior

24    felony convictions, had cooperated with law enforcement, was extremely intoxicated at the

25    time of the crime, was capable of rehabilitation, was cared for by both family and friends,

26    expressed remorse, and was generally a good person despite being a highly dysfunctional

27    individual. (*Id.* at 13, 16, 19, 25, 34, 35.)

28     Counsel emphasized two other factors – the disproportionate sentence received by co-

1    defendant Brazeal and Petitioner's mental condition and behavioral disorders. (*Id.* at 26-41.)

2    With regard to the latter, counsel clarified that the court must consider Petitioner's

3    diminished capacity both in the context of his state of mind at the time of the offense, *see*

4    A.R.S. § 13-703(G)(1), and as mitigation evidence generally, irrespective of whether

5    Petitioner's disorder affected his behavior at the time of the incident itself. (*Id.* at 26-27.)

6    Counsel stressed that Petitioner's dysfunction was evidenced not solely by psychological

7    testing, but by medical testimony from a neurologist indicating that Petitioner's ability to

8    control his impulses and anger were impaired by numerous brain injuries and that these

9    impairments were exacerbated by Petitioner's long-term abuse of alcohol and drugs. (*Id.* at

10   30.) He further pointed out that the neurological and psychological reports were consistent

11   and supported one another, especially in view of the fact that Dr. Morris completed his

12   psychological evaluation well before Dr. Mayron conducted his neurological examination.

13   (*Id.* at 28.) In addition, the 1978 hospital admission report reflected that Petitioner was

14   depressed, suicidal, unable to keep a job, and had an unstable childhood – reinforcing Dr.

15   Morris's evaluation fourteen years later – and other hospital records documented at least two

16   of Petitioner's severe head injuries. (*Id.* at 29-30.)

17       In arguing that Dr. Morris's evaluation was significant, counsel reiterated that

18   Petitioner's borderline personality disorder means he is a reactive, not reflective, person. (*Id.*

19   at 31.) "[Petitioner] has a difficult time controlling emotion. He reacts hostile. He reacts

20   angrily." (*Id.*) Detailing Petitioner's unstable childhood, counsel explained that this history

21   was consistent with Dr. Morris's borderline personality disorder diagnosis, as was

22   Petitioner's lifestyle, reclusive behavior, transitory employment history, and history of

23   dysfunctional relationships. (*Id.*) Counsel argued:

24           Now, the importance of this [history] is not only that some of the difficulty
             in the childhood may have difficulty [sic] and extend some ideas of leniency. The
25           importance is also the consistency of that lifestyle and the childhood with the
             psychological and neurological evaluations.
26
             A person has difficulty with impulse control and poor judgment and emotion
27           control and anger. Why?

28           Well, it's not because he woke up that way. It's because of a history. And

                                          - 18 -

the court knows the majority of people that come in here on any criminal offenses have problems – poor upbringing, poor childhood, poor education, alcohol and drugs.

If it is extreme enough and if it manifests itself in psychological and neurological disorders, it is something to consider why someone does certain behavior and whether someone should receive a sentence of death.

(*Id.* at 33-34.)

D.   Sentencing

Petitioner was sentenced on July 14, 1992.   (RT 7/14/92.)   Prior to sentencing, Petitioner gave the following statement:

I would like to say that I think it's very clever the way I have been made a scapegoat in this case.

I do not deny culpability, but there was no premeditation on my part.

What I am guilty of is being an irresponsible person for most of my life, running from responsibility, living in a fantasy world and it was my irresponsibility on the night that this incident occurred that involved me in the incident.

There is no words that can express the grief and the sorrow and the torment I have experienced over this, but I am just going to leave everything in the hands of God because that's where it is anyway.

That's all I have to say.

(*Id.* at 4-5.)

In his special verdict, the sentencing judge found three aggravating factors: (1) Petitioner was an adult (38 years old) at the time of the offenses, and the victims were under fifteen years of age; (2) Petitioner committed multiple homicides; and (3) Petitioner committed the offenses in an especially heinous, cruel, or depraved manner. (ROA I at 1284-87; RT 7/14/92 at 28-34.)

Regarding the second factor, the court found:

The defendant was found guilty of two murders.  Each conviction of murder in the first degree is an aggravated circumstance to the other conviction.

The evidence established beyond a reasonable doubt that the defendant himself, with his own hands and feet, with the force of his own strength against this thirteen year old child, murdered Mandy Ruth Marie Meyers.  The evidence shows with equal persuasion that the life of the other child, Mary Raylene Snyder, was similarly forcefully taken by Randy Ellis Brazeal, a co-defendant as originally charged.

- 19 -

Defendant's statement, given to Sheriff's Detective Rothrock shortly after his arrest, disclosed the conspiracy to kill both girls to cover up the sexual assaults; to escape detection; to eliminate the victims as witnesses.

The evidence clearly established that the defendant engaged in sexual intercourse with Mandy Ruth Marie Meyers.

The injuries to the bodies were similar. The deaths were of like cause. The bodies were thrown into the same watery mine shaft. It was defendant's shoe prints stamped in the Meyers child's body. Some of the marks on the body of the other child may have been from Brazeal's shoes. From the evidence of the medical examiner, it appears likely.

The defendant contributed to the death of one child just as surely as he killed the other. He was the elder, perhaps even the brighter. Even to be influenced by the younger perpetrator lessens neither the crime nor the conviction. Just as he is responsible for the death of Mandy Ruth Marie Meyers, so is he responsible for the killing of Mary Raylene Snyder, and for the manner of her death. The defendant was found guilty of the murder in the first degree of Mary Raylene Snyder though the killing was at the hands of Randy Ellis Brazeal. The jury so found.

(ROA I at 1285.)

Regarding the especially heinous, cruel, or depraved aggravating factor, the court found:

These elements are in the disjunctive. An act may have the qualities of more than one. Only one need be found to meet this circumstance.

Defining the standards of any of these elements is [sic] not been an easy task. The cases are replete with example, both for those that demonstrate the standards, and those that fall short. The facts of this case were compared to those contained in the case law of this state.

**The Elements of Especially Heinous or Depraved**

The terms, "heinous" and depraved" focus on the defendant's mental state and attitude as reflected by his words and actions.

The defendant had a knife. Both victims were stabbed, Mandy Ruth Marie Meyers through the right eye to the bony socket, and Mary Raylene Snyder in the vicinity of her right eye. The stabbings were acts of gratuitous violence which, surely, could not have been calculated to lead to death.

The stomping of the bodies, apparently after unconsciousness when the struggle for life had ceased, were acts of unnecessary and gratuitous violence, designed to still the unconscious bodies and assuage the killers' discomfort from the reflexes of death.

The stabbings and stompings of the bodies were mutilations.

Though the sexual conduct crimes committed with these young girls are serious crimes, the killings were senseless and the victims were helpless. These

- 20 -

young lives were snuffed out, as insects, merely to eliminate them as witnesses.

The manner of killing and disposition of the bodies demonstrate an obdurate disregard for human life and human remains.

**The Element of Cruelty**

The victims were alive for some minutes from the start of the fatal assaults. They experienced great physical pain and mental anguish as they fought to free themselves. There were frequent repositioning of the hands of the killers on the throats of the victims, and the reasserting of the pressure until they were unconscious. Medical evidence cannot establish the moment of cessation of consciousness, when, supposedly, physical pain ceases, but did show that death was not instantaneous.

It was a cruel death for both victims, considering the extent of physical injuries to the bodies, much of which must have been experienced while conscious.

The defendant entered into an agreement with Brazeal to kill both girls. The method of killing and manner of death, including the stomping on the bodies, are remarkably similar considering they were done at night in the desert. The killings were simultaneous though the deaths may not have been. The defendant, just as surely as he did with Mandy Ruth Marie Meyers, intended the killing of Mary Raylene Snyder. The elements of these aggravating circumstances apply to the defendant equally as to both murders.

(*Id.* at 1286-87 (citations omitted).)

The sentencing judge then considered all of the mitigation factors urged by Petitioner, but determined that none were sufficiently substantial to call for leniency. (*Id.* at 1288-91.) Regarding Petitioner's lack of a prior felony record, the court found that Petitioner "has a history of arrests and misdemeanor convictions, from driving while intoxicated to assaults and domestic violence." (*Id.* at 1288.) Because Petitioner's "professed law abiding qualities are illusory," the court found that his lack of a prior felony conviction was not a mitigating circumstance. (*Id.*)

As for Petitioner's cooperation with law enforcement, the court noted:

The defendant gave a statement to a sheriff's detective implicating himself and Randy Ellis Brazeal. The statement discloses denials of the whereabouts of the two girls, a concocted story, deception, and evasion. Only after significant information known to the sheriff's office was disclosed, specifically a mine shaft around Gleeson, did defendant admit to the killings. Even then, he attempted to mitigate his own involvement and blame Brazeal.

The statement did not disclose the entire truth. In light of that already known by law enforcement authorities, and the manner and quality of defendant's

statement, his words and actions can hardly be considered cooperation with law enforcement.

(*Id.* at 1288-89.) Because "the words and actions of defendant in assisting law enforcement officers were designed to shift responsibility and to reduce his culpability in light of the inextricability of his position," the court found that these were not mitigating circumstances. (*Id.* at 1289.)

The court further rejected the unequal sentence given to Petitioner's co-defendant, Randy Brazeal, as a mitigating circumstance. (*Id.*) The court explained:

> The co-defendant, Randy Ellis Brazeal, received a twenty year sentence on his plea to second degree murder. The state was awaiting the results of DNA testing. Brazeal's lawyers insisted on a speedy trial pursuant to the Rule 8, Rules of Criminal Procedure. The results of the tests would not have been available until long past the speedy trial deadline for Brazeal.

> The disparity in the charges and therefore the possible sentences for the two defendants is a direct result of the disparity in the available evidence at the time each could have gone to trial. Lacking DNA evidence for the Brazeal case, the state elected to enter into a plea agreement.

(*Id.*)

As for Petitioner's alcohol abuse and intoxication, the court noted:

> Defendant has a long history of alcohol abuse. On the night in question, he claims to have drunk heavily. The statement given to Detective Rothrock of the Cochise County Sheriff's Office displayed substantial recall and detail, and a sufficient understanding of the events at the time of the murders and his own complicity and responsibility.

(*Id.*) Therefore, the court found beyond a reasonable doubt that "at the time of the killing, the defendant's capacity to appreciate the wrongfulness of his conduct was not significantly impaired. Alcohol abuse over an extended period of defendant's life, and his drinking at the time of the killings are not mitigating circumstances under the facts of this case." (*Id.* at 1289-90.)

The court also found that Petitioner's "claimed difficulties in his early years and the conditions of his early home life are not mitigating circumstances" because "[t]he evidence, at best, is inconsistent and contradictory"; the court noted "little evidence" of physical abuse by his elders. (*Id.* at 1290.) As for Petitioner's mental condition and behavior disorders, the court noted:

1

2          The defendant claims a chaotic childhood and a dysfunctional family, which
       included abuse, neglect and hyperreligiosity; an abuse of drugs at a young age; a
3      history of psychological problems involving suicidal ideation and depression; and
       having experienced serious head injuries.  A psychologist testified that he has
4      difficulty with impulse control and has poor judgment.

5          FINDING: This court finds nothing unusual about the myriad of problems
       presented by defendant except in their inclusiveness.  Character or personality
6      disorders to the extent demonstrated by the evidence in this case are not mitigating
       factors.  Having suffered head injuries and having difficulty with impulse control
7      sheds little light on defendant's conduct in this case.  The evidence does not show
       defendant acted impulsively, only criminally, with evil motive.  This court finds
8      the defendant's mental condition and alleged behavior disorders are not mitigating
       circumstances.

9   (*Id.* at 1290-91.)

10      The court further found insufficient evidence to support Petitioner's claim of good

11  character as a mitigating circumstance.  (*Id.* at 1291.)  Rather, "[e]vidence presented on the

12  separate sentencing hearing as to good character was effectively impeached by testimony of

13  defendant's actions with regard to two former wives."  (*Id.*)  Furthermore, Petitioner's claim

14  of "[g]ood behavior belies the other claimed mitigating circumstances" of alcohol abuse, a

15  history of violence, difficulty in his early years, a dysfunctional family, difficulty with

16  impulse control, and an abusive background.  (*Id.*)  The court summarily rejected Petitioner's

17  good behavior while incarcerated and lack of future dangerousness while confined to prison

18  as mitigating circumstances.  (*Id.* at 1291.)

19      Finally, the court stated that it was "unable to glean any mitigating circumstances not

20  suggested by [Petitioner's] counsel."  (*Id.*)  In conclusion, the sentencing judge determined

21  that even if any or all of Petitioner's claimed mitigating circumstances were found to exist,

22  "balanced against the aggravating circumstances found to exist, they would not be

23  sufficiently substantial to call for leniency."  (*Id.* at 1292.)

24      E.   Direct Appeal

25      On appeal, the Arizona Supreme Court conducted its statutorily-required independent

26  review of Petitioner's capital sentences.  *Stokley*, 182 Ariz. at 516, 898 P.2d at 465.  After

27  determining that the evidence supported the trial court's findings as to the aggravating

28  factors, the court addressed each of Petitioner's claimed mitigating factors.

- 23 -

The court first assessed Petitioner's claim that, under A.R.S. § 13-703(G)(1), his capacity to appreciate the wrongfulness of his conduct was impaired on the basis of alcohol consumption, head injuries, and mental disorders. *Id.* at 520-22, 898 P.2d at 469-71. Regarding Petitioner's alcohol use, the court stated:

> Voluntary intoxication may be mitigating if the defendant proves by a preponderance of the evidence that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

> There was evidence that defendant and co-defendant consumed alcohol on the day of the murders. James Robinson, who was present at the campsite the night of the crimes, testified that defendant consumed beer and whiskey that night, but that he was not so drunk that he could not maneuver himself. Roy Waters, age fifteen, testified that he saw defendant drinking beer in the afternoon and that he appeared drunk. Cory Rutherford, age thirteen, testified that he observed defendant drinking out of a bottle. Various witnesses testified that co-defendant Brazeal was drinking and appeared intoxicated, more so than defendant. At approximately 12:30 a.m. on the morning of the murders, defendant, accompanied by Brazeal, purchased a six-pack of Budweiser and a pint of Jim Beam. The morning after the campout, the owner of the site where the girls camped found an empty quart bottle of whiskey, an empty half pint bottle of whiskey, and an empty package of Budweiser, but these items were never tied to defendant. Based entirely on defendant's self-reported consumption and self-reported blackout on the night of the crimes, a clinical psychologist opined that defendant's capacity to appreciate the wrongfulness of his conduct was significantly impaired at the time of the incident.

> However, there is much evidence showing defendant was not significantly impaired by alcohol at the time of the murders and did not suffer a blackout at the time of the crimes. Defendant disposed of the bodies and burned the clothing of the victims, thus showing that he knew the conduct was wrongful. He was able to accurately guide the officers back to the crime scene. Defendant also had substantial recall of the events and attempted to cover up the crimes, causing the trial court to find that defendant's capacity to appreciate wrongfulness was not substantially impaired. "[S]tacked against the testimony offered in mitigation by defendant is the evidence that defendant *did know* that his . . . conduct was wrongful."

> We agree with the trial court that defendant failed to show that he was significantly impaired during the time of the crimes so as to meet the statutory mitigation requirements.

*Id.* at 520-521, 898 P.2d at 469-70 (alteration in original) (citations and footnote omitted).

As for Petitioner's head injuries, the court further found:

> Head injuries that lead to behavioral disorders may be considered a mitigating circumstance. Evidence indicates that defendant suffered three head injuries since 1982. A neurologist who reviewed the medical records testified that defendant had suffered a compound depressed skull fracture, underwent surgery,

and suffered permanent damage in 1982 from being hit with a heavy beer mug. In 1986, he struck his head on the pavement after jumping onto the hood of his wife's moving vehicle.  About a year before the murders, he suffered a severe head injury when another wife hit him with a cast iron skillet.  Other head injuries alleged by defendant were uncorroborated.

According to the neurologist, such injuries "could impair his ability to understand his environment, to interpret it correctly and to respond correctly to it," potentially manifesting in decreased control of impulsive behavior and decreased cognitive ability.  Alcohol use increases any lack of control.  The neurologist concluded that defendant's brain "integrity" was moderately to severely impaired due to previous brain or head injuries, resulting in impulsive behavior.  A clinical psychologist said that defendant suffers from an inability to control impulse and that this problem is exacerbated by alcohol.

The trial court found:  "Having suffered head injuries and having difficulty with impulse control sheds little light on defendant's conduct in this case.  The evidence does not show defendant acted impulsively, only criminally, with evil motive."  While we give more mitigating weight to this element than did the trial court, it is substantially offset by the fact that defendant's test results showed that he has above average intelligence (an I.Q. of 128), and the facts show that he did not exhibit impulsive behavior in the commission of the crimes.  Defendant appreciated the wrongfulness of his conduct, as evidenced the next day by his comment to the interrogating officer, "I . . . choked 'em. . . .  There was one foot moving though I knew they was brain dead but I was getting scared. . . .  And they just wouldn't quit.  It was terrible."  His prior head injuries do not show that defendant was unable to conform or appreciate the wrongfulness of his conduct.

*Id.* at 521, 898 P.2d at 470 (citations omitted).

The Arizona Supreme Court also addressed Petitioner's mental disorders:

While a patient at a Texas hospital in 1971, defendant was diagnosed with a passive-aggressive personality.  In 1978, he was re-admitted to the same hospital for psychotic depression.  Defendant reported feeling suicidal, along with a fear that he might harm someone else.   The final diagnosis of the second hospitalization was that defendant suffered from a personality disorder with differential to include passive-aggressive personality, antisocial personality, and borderline personality.

In a proceeding to determine defendant's competency to stand trial, a clinical psychologist found that defendant "does not appear to be suffering from any psychotic disorder but he has a history of depression and other serious psychological problems," including a pattern of impulsivity.  Defendant also claimed to have attempted suicide twice.  The psychologist testified that defendant suffered from a borderline personality disorder and depression.  He concluded that defendant is a "seriously dysfunctional individual."

Character or personality disorders alone are generally not sufficient to find that defendant was significantly impaired.  A mental disease or psychological defect usually must exist before significant impairment is found.

Despite this evidence, "[t]his case does not involve the same level of mental disease or psychological defects considered in other cases in which the § 13-703(G)(1) mitigating circumstance was found to exist."  Defendant failed to

- 25 -

show that his ability to control his actions was substantially impaired; his actions showed that he appreciated the wrongfulness of his conduct.  Evidence showed that defendant was familiar with the mine shaft and discussed killing the girls with Brazeal.  Defendant sexually assaulted Mandy, choked her and stomped on her body, and agreed that Mary should also be killed.  Defendant then attempted to cover up the crimes by dumping the bodies in the mine shaft and burning the girls' clothes.  "The record reveals that defendant made a conscious and knowing decision to murder the victim[s] and was fully aware of the wrongfulness of his actions."  This evidence fails to meet the statutory burden by a preponderance of the evidence.

*Id.* at 521-22, 898 P.2d at 470-71 (citations omitted).[8]

The Arizona Supreme Court also independently reviewed the eleven nonstatutory mitigating circumstances discussed in the trial court's special verdict and determined that Petitioner failed to prove nine of them.  *Id.* at 522-24, 898 P.2d at 471-73.  The court found that Petitioner's lack of prior felony record was a nonstatutory mitigating circumstance, but that its weight was substantially reduced by his other past problems with the law.  *Id.* at 523, 898 P.2d at 472.  The court also found that Petitioner's "documented mental disorders are entitled to some weight as nonstatutory mitigation."  *Id.* at 524, 898 P.2d at 473.[9]  The Arizona Supreme Court concluded:

There are three statutory aggravating circumstances.  There are no statutory mitigating circumstances.  We have considered the nonstatutory mitigating factors of lack of prior felony record and his mental condition and behavior disorders.  We find the mitigation, at best, minimal.  Certainly, there is no mitigating evidence sufficiently substantial to call for leniency.

*Id.* at 525, 898 P.2d at 474.

## II.   IAC Standard of Review

To prevail on an IAC claim, a petitioner must show that counsel's performance was

---

[8]   Petitioner raised for the first time on appeal the additional statutory mitigating circumstances of relatively minor participation and no reasonable foreseeability that conduct would create grave risk of death to another, both of which the Arizona Supreme Court rejected.  *Stokley*, 182 Ariz. at 522, 898 P.2d at 417 (citing A.R.S. § 13-703(G)(3) & (4)).

[9]   Petitioner raised for the first time on appeal the additional nonstatutory mitigating circumstances of felony murder instruction, remorse, and lack of evidence showing that he actually killed or intended to kill Mary, all of which the Arizona Supreme Court rejected.  *Stokley*, 182 Ariz. at 524-24, 898 P.2d at 473-74.

1   deficient and that the deficient performance prejudiced his defense.  *Strickland v.*
2   *Washington*, 466 U.S. 668, 687 (1984).  The performance inquiry is whether counsel's
3   assistance was reasonable considering all of the circumstances.  *Id.* at 688-89.  "[A] court
4   must indulge a strong presumption that counsel's conduct falls within the wide range of
5   reasonable professional assistance; that is, the defendant must overcome the presumption
6   that, under the circumstances, the challenged action 'might be considered sound trial
7   strategy.'"  *Id.* at 689.

8       A petitioner must affirmatively prove prejudice.  *Id.* at 693.  To demonstrate prejudice,
9   he "must show that there is a reasonable probability that, but for counsel's unprofessional
10  errors, the result of the proceeding would have been different.  A reasonable probability is
11  a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  The *Strickland*
12  Court explained that "[w]hen a defendant challenges a death sentence . . . the question is
13  whether there is a reasonable probability that, absent the errors, the sentencer . . . would have
14  concluded that the balance of aggravating and mitigating circumstances did not warrant
15  death."  466 U.S. at 695.  In *Wiggins v. Smith*, the Court further noted that "[i]n assessing
16  prejudice, we reweigh the evidence in aggravation against the totality of available mitigating
17  evidence." 539 U.S. 510, 534 (2003); *see also Mayfield v. Woodford*, 270 F.3d 915, 928 (9th
18  Cir. 2001) (en banc).  The "totality of the available evidence" includes "both that adduced
19  at trial, and the evidence adduced" in subsequent proceedings.  *Wiggins*, 539 U.S. at 536
20  (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)).

21      In order to assess and reweigh the aggravation and mitigation, this Court must consider
22  the relevant provisions of Arizona's death penalty statute.  Under A.R.S. § 13-703(G),
23  mitigating circumstances are any factors "relevant in determining whether to impose a
24  sentence less than death, including any aspect of the defendant's character, propensities or
25  record and any of the circumstances of the offense."  Mitigation evidence can be presented
26  regardless of admissibility and need only be proven by a preponderance; the burden is on the
27  defendant to prove mitigation.  A.R.S. § 13-703(C); *State v. Harding*, 137 Ariz. 278, 670
28  P.2d 383 (Ariz. 1983).  The court shall impose a sentence of death if it finds at least one

1  aggravating circumstance and "that there are no mitigating circumstances sufficiently

2  substantial to call for leniency."  A.R.S. § 13-703(E).

3      The Arizona courts assess whether mitigating factors are proven and consider "the

4  quality and strength of those factors."  *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849

5  (2006).  Mitigating evidence must be considered regardless of whether there is a "nexus"

6  between the mitigating factor and the crime, but the lack of a causal connection may be

7  considered in assessing the weight of the evidence.  *Id.*; *State v. Hampton*, 213 Ariz. 167,

8  185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty and not

9  sufficiently substantial to call for leniency, in part, because not tied to the offense).  When

10  the experts indicate that a defendant "knew right from wrong and could not establish a causal

11  nexus between the mitigating factors and [the] crime," the Arizona courts may accord

12  evidence of abusive childhood, personality disorders, and substance abuse limited value.

13  *State v. Johnson*, 212 Ariz. 425, 440, 133 P.3d 735, 750 (2006).

14  **III.  Analysis**

15      Petitioner asserts that trial counsel failed to adequately prepare or investigate

16  Petitioner's mental state and that this deficiency resulted in a failure to present compelling

17  mitigating evidence at sentencing.  (Dkt. 33 at 19.)

18      Petitioner raised this claim in his supplemental state PCR petition but proffered no

19  evidence in support.  (ROA III at 6-7.)  Rather, he stated summarily, "An evidentiary hearing

20  is warranted on this issue, at which time evidence will be presented in mitigation of

21  Petitioner's sentence."  (*Id.* at 7.)  In denying relief, the PCR court stated:

22      Claim B, alleging ineffective representation for failure to adequately argue
   Stokley's alleged mental incapacity as mitigation for sentencing purposes, is
23  precluded under Rule 32.2(a)(2) and A.R.S. § 13-4232(A)(2) because the Arizona
   Supreme Court rejected the factual basis of this claim on direct appeal.  Moreover,
24  Stokley offers nothing specific nor material concerning his mental condition that
   was not before this Court at sentencing or considered when the appellate court
25  conducted its independent review.  Thus, this claim is also precluded for lack of
   sufficient argument, and it is meritless for lack of a showing of prejudice.
26  *Strickland*, 466 U.S. at 690-93.

27  (*Id.* at 54-55.)

28      A.  <u>Evidentiary Development</u>

1    In its August 31, 2006 order regarding the procedural status of Petitioner's claims, the

2    Court directed Petitioner to specifically identify in his merits memorandum the facts or

3    evidence "sought to be discovered, expanded or presented at an evidentiary hearing." (Dkt.

4    70 at 37.)  Petitioner argues that a federal evidentiary hearing is necessary to establish his

5    claim but provides only brief references to the type of evidence that would be presented.  He

6    asserts at the start of the prejudice discussion in his merits brief that a "complete social

7    history is needed before the door is closed on the evaluation of Petitioner's

8    mental/neurological condition." (Dkt. 83 at 25-26.)  Presumably, Petitioner seeks a hearing

9    to present such evidence as well as the new expert evidence he has developed and appended

10   to his briefs in these proceedings.  (*Id.* at 35.)  It is also apparent, from review of his briefs,

11   that Petitioner's request for development is focused on establishing prejudice arising from

12   counsel's allegedly deficient performance.  (*See, e.g.*, Dkt. 90 at 4 ("Petitioner presented a

13   colorable claim that his counsel had performed deficiently at his sentencing and he asked for

14   an opportunity to present *evidence of prejudice* at a hearing.") (emphasis added).)  Nowhere

15   does Petitioner assert that evidentiary development is necessary to establish deficient

16   performance.

17   　　The Antiterrorism and Effective Death Penalty Act imposed new limitations on the right

18   of a habeas petitioner to develop facts in federal court.  *See* 28 U.S.C. § 2254(e)(2).

19   Development is precluded, absent narrow exceptions, if the failure to develop a claim is due

20   to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's

21   counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  The parties focus in their briefs on

22   the issue of diligence.  However, as discussed next, Petitioner has failed to allege facts that,

23   if true, would entitle him to relief.  Therefore, he is not entitled to an evidentiary hearing, *see*

24   *Townsend*, 372 U.S. at 312-13, and the Court need not analyze whether Petitioner failed to

25   diligently develop his claim in state court.

26   　　B.  　New Evidence

27   　　Petitioner proffers declarations from four experts, including Drs. Mayron and Morris.

28   (Dkt. 49, Ex. 1; Dkt. 64, Exs. 1-3.)  Dr. Mayron states that he does "not recall" whether he

was consulted by Petitioner's counsel between the March 1992 examination and his testimony in June 1992. "If they had contacted me, I would have recommended that Mr. Stokley be examined by a qualified neuropsychologist." (Dkt. 64, Ex. 2 at 2.) In Dr. Mayron's opinion, "neuropsychological testing is a critical component in the evaluation of Mr. Stokley's mental state on or about the time of the offense." (*Id.* at 3.) Dr. Morris similarly declares that he recommended to counsel that Petitioner be examined "by a qualified neuropsychologist" to consider the effect of Petitioner's brain injury. (Dkt. 64, Ex. 1 at 3.)

Recent testing by Dr. R. K. McKinzey, a neuropsychologist, confirms Dr. Mayron's finding of left brain injury. (Dkt. 49, Ex. 1 at 7.) His testing also revealed, for the first time, frontal lobe damage to Petitioner's brain. (*Id.*) According to Dr. McKinzey, "frontal lobe brain deficits, such as those evident in Mr. Stokley, are and have long been associated with impulsivity, impaired judgment, disinhibition, and sometimes uncontrollable outbursts of aggression or rage grossly out of proportion to any precipitating psycho-social stressor." (*Id.* at 9.) Furthermore, Petitioner's frontal lobe deficits "have resulted in character traits of organic origin which cause Mr. Stokley to act reflexively rather than reflectively." (*Id.* at 10.) In Dr. McKinzey's opinion, because Petitioner had previously expressed no interest in sexually molesting children and intended only to take a bath on the night of the offense, Petitioner's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law must have been significantly impaired because "the circumstances giving rise to the offense mirror the type of unplanned, over-reactive and highly explosive episodes associated with Mr. Stokley's frontal lobe damage." (*Id.*)

Petitioner also provides a declaration from a new psychologist, Dr. Todd Flynn. (Dkt. 64, Ex. 3.) He confirms Dr. Morris's diagnosis of Borderline Personality Disorder (based primarily on Petitioner's depression, suicidal ideation, and inability to maintain personal relationships and employment), but criticizes Dr. Morris for failing to take into account the possibility that Petitioner's conduct at the time of the offense was significantly caused by an organic brain dysfunction. (*Id.* at 2, 4-6.) Dr. Flynn also observes that Dr. Mayron's

1  examination did not reveal Petitioner's frontal lobe damage and asserts that "neither Dr.

2  Morris nor Dr. Mayron were able to establish the link between Mr. Stokley's brain damage

3  and the nature of his participation in the offense."   (*Id.* at 2-3.)   In his opinion,

4  "neuropsychological testing was requisite to the understanding of the organic brain

5  dysfunction affecting Mr. Stokley at the time of the instant offense." (*Id.* at 2.) Dr. Flynn

6  concludes:

> Overall, it remains my opinion that clinically significant organic deficits affecting the frontal lobes of his brain, were active at the time of the current offenses and are likely to have had an impact on his participation in the offenses, especially in terms of his control of impulses, angry emotions and aggressive behavior.  In addition, I conclude that these organic deficits furnish the most powerful reason to believe that Mr. Stokley was likely to have been significantly impaired at the time of the offenses in his ability to conform his conduct to the requirements of the law.   These deficits, either alone, but especially in combination with the Borderline Personality Disorder have the potential to have impaired Mr. Stokley's functioning on or about the time of the offense to the point at which he was unable to conform his behavior to the requirements of the law.

13  (*Id.* at 7.)

14      C.   Performance Prong

15      In denying relief on Petitioner's IAC claim, the PCR court ruled only that Petitioner had

16  failed to establish prejudice; it did not reach the issue of whether counsel's performance was

17  deficient.  (ROA III at 54-55.)  Because the state court did not reach this prong of the

18  *Strickland* analysis, the Court reviews this portion of the claim de novo. *Rompilla v. Beard*,

19  545 U.S. 374, 390 (2005).  Habeas counsel have not requested any specific evidentiary

20  development to establish deficient performance and have proffered only expert declarations

21  in support of this claim; they have not provided declarations from any of Petitioner's trial and

22  sentencing attorneys or from Petitioner himself to shed light on counsel's decisions with

23  regard to the mental health investigation.

24      Petitioner alleges that defense counsel "undertook a very limited investigation into

25  Petitioner's health and mental state during the time of the offense." (Dkt. 33 at 20.)  He

26  characterizes counsel's pretrial investigation as based solely on whether Petitioner was

27  competent to stand trial.  (*Id.*)  He further argues that Dr. Morris's psychological evaluation

28  was incomplete without "a competently performed neuropsychological examination to assess

(i) whether the Petitioner had brain damage and more important (ii) the specific effects of such brain damage on his cognition and behavior." (*Id.* at 20-21.) Petitioner also asserts that counsel referred him to a neuropsychologist for testing, "but the testing was never completed. Instead counsel for Petitioner had him examined by a neurologist, Dr. Michael Mayron." (*Id.* at 21.)  In turn, Dr. Mayron opined that Petitioner had a severe brain injury, but counsel failed to obtain neuropsychological testing to determine how this damage impacted Petitioner's cognition and functioning.  (*Id.*)  According to Petitioner, this constitutes deficient performance because Dr. Mayron testified that he was not competent to perform neuropsychological testing or to specifically address the effects of Petitioner's brain damage on his behavior.  (*Id.* at 21; Dkt. 83 at 20.)  In addition, defense counsel never interviewed Dr. Mayron prior to sentencing; had he done so, Petitioner argues, Dr. Mayron would have recommended neuropsychological testing to "pinpoint more clearly the effects of the brain injury." (Dkt. 33 at 22; Dkt. 83 at 20.)

To evaluate the performance of counsel for Sixth Amendment purposes, the relevant perspective is at the time of sentencing, not afterwards when it is apparent that counsel did not succeed in avoiding the death penalty.  Petitioner has focused on what "defense counsel could have presented, rather than upon whether counsel's actions were reasonable." *Turner v. Calderon*, 281 F.3d 851, 877 (9th Cir. 2002).  After reviewing the entirety of the state court record, as well as Petitioner's proffered new evidence, the Court concludes that Petitioner is unable to show that defense counsel's performance was constitutionally deficient.

First, the Court rejects Petitioner's unsubstantiated assertion that counsel "undertook a very limited investigation" into his health and mental state at the time of the offense and limited the defense investigation to whether Petitioner was competent to stand trial.  (Dkt. 33 at 20.)  The Court finds that counsel undertook a reasonable investigation into Petitioner's social, medical, and mental health history.  They enlisted a mitigation investigator who obtained a significant amount of background information about Petitioner's upbringing, education, relationships, and military and work history.  Counsel also spoke with numerous

1    family members and friends and gathered significant documentation of serious head injuries

2    and prior hospitalizations for suicidal ideation.  (ROA I at 228, 255.)  They obtained an

3    evaluation from Dr. Hoffman, who, just weeks prior to the offense, had conducted

4    neuropsychological testing of Petitioner and found no evidence of brain damage.  Despite

5    this report, counsel sought neuropsychological and neurological testing from Drs. Barbour

6    and Maynor and a psychological evaluation from Dr. Morris.  Petitioner has not alleged that

7    counsel failed to discover and provide to the experts additional significant medical history

8    or that the experts required additional information to form reliable opinions.

9        More significantly, months before trial commenced, counsel requested that Petitioner

10   be evaluated by both a psychologist and a neuropsychologist under Rule 11 of the Arizona

11   Rules of Criminal Procedure.[10]  In both motions, counsel emphasized the requirement in a

12   capital-eligible case to investigate potential mitigation evidence.   Counsel referenced

13   Arizona's capital sentencing statute, including the provision under A.R.S. § 13-703(G)(1)

14   identifying as a mitigating factor significant impairment to a defendant's capacity to

15   appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of

16   the law.  (ROA I at 217, 224.)  In their request for a psychologist, counsel stated they were

17   not requesting an examination to determine Petitioner's competency, but rather his state of

18   mind at the time of the incident.  (*Id.* at 216.)  In the request for a neuropsychologist, counsel

19   reiterated that it is "a significant factor at trial *and sentencing* to determine the Defendant's

20   state of mind."  (*Id.* at 224 (emphasis added).)

21       It was only after the trial court questioned whether Petitioner's alleged suicidal ideation,

22

23            [10]        At the time of Petitioner's prosecution, Rule 11 provided:

24            At any time after an information is filed or indictment returned, any
25       party may move for an examination to determine whether a defendant is
         competent to stand trial, or to investigate his mental condition at the time of
26       the offense.   The motion shall state the facts upon which the mental
         examination is sought.
27

28   Ariz. R. Crim. P. 11.2 (West 1987).

                                        - 33 -

drug abuse, psychotic depression, and personality disorders provided a basis under Rule 11 for the requested examinations that counsel noticed insanity as a defense and alleged that Petitioner was not competent to assist in his defense.  (RT 9/6/91 at 7-8; RT 9/12/91 at 3-6.) It is evident from the record that counsel understood the necessity of evaluating Petitioner's mental state at the time of the crime in anticipation of sentencing and re-framed the issue in terms of competency and an insanity defense to facilitate the court's appointment of experts. The fact that counsel's investigation of Petitioner's mental health was not limited solely to the issues of competency or insanity is confirmed by the following colloquy between defense counsel and Dr. Morris at the presentence hearing:

> Q    When you were contacted to do an evaluation in this case, you were asked to do more than look into the legal state of insanity; is that correct?
>
> A    That's correct.
>
> Q    What other things were you requested?
>
> A    Again, looking at the overall personality characteristics and, you know, how that might relate to the instant offense.
>
> Q    Were you asked to determine, for example, whether there was any mental disorders, whether they amounted to insanity or not?
>
> A    That's correct.
>
> Q    Were you asked to look at the childhood of the defendant?
>
> A    Yes, I was.
>
> Q    Were you asked to make a diagnosis of this defendant?
>
> A    I don't think there was a specific question about making a formal diagnosis, but generally, you know, what seems to be, if there is anything wrong with this individual, what are the general categories.
>
> Q    Were you asked to determine competency?
>
> A    Yes, I was.
>
> Q    Were you asked to make a determination under State v. Christensen and state reactive versus reflective?
>
> A    Yes.
>
> Q    Were you asked to prepare and consider this case for a possible sentencing hearing?

1          A    Yes.

2    (RT 6/18/92 at 62-63.)  Petitioner's summary assertion that counsel undertook a limited

3    investigation into Petitioner's state of mind at the time of the offense is refuted by the record.

4          Second, Petitioner has failed to address, much less proffer evidence to counter, the clear

5    implication in the record that Petitioner was in fact seen by a neuropsychologist, Dr. John

6    Barbour.  Petitioner states only that he "was referred to a neuropsychologist for testing, but

7    the testing was never completed.  Instead counsel had Petitioner examined by a neurologist,

8    Dr. Michael Mayron."  (Dkt. 83 at 19.)  As detailed in the factual background above,

9    Petitioner's motion for a neuropsychological examination was granted by the trial court.  (RT

10   9/12/91 at 14.)   Petitioner requested the appointment of Dr. Barbour, and the Court

11   subsequently signed orders directing that Petitioner be transported to Dr. Barbour's office

12   on October 22 and November 6, 1991.  (ROA I at 223, 437, 445.)  Most tellingly, Dr. Morris

13   states in his report that he reviewed an MMPI-2 profile administered to Petitioner by Dr.

14   Barbour on November 6, 1991.  (Dkt. 61, Ex. G at Morris Rpt.)  This is the same type of

15   testing that Dr. Mayron, during the presentence hearing, stated would be helpful to determine

16   the behavioral impact of brain injury.  (RT 6/17/92 at 66.)  Petitioner bears the burden to

17   establish deficient performance, and he has proffered nothing from either defense counsel

18   or Dr. Barbour to substantiate his claim that neuropsychological testing was authorized but

19   not completed.[11]  To the contrary, the Court finds on this record that such testing was in fact

20   undertaken by Dr. Barbour, at least with respect to an MMPI.

21         Third, even if neuropsychological testing had not been undertaken, Petitioner's claim

22   fails because the state court record reveals that neither Dr. Morris nor Dr. Mayron

23   affirmatively recommended to counsel that Petitioner be examined only by a

24   neuropsychologist.  Dr. Morris states in a declaration prepared for these habeas proceedings

25   that he had recommended to counsel that Petitioner be examined "by a qualified

26

27         [11]    The Court notes that Petitioner has not claimed that his trial and sentencing
28   attorneys were unavailable or unwilling to be interviewed for these proceedings.

1   neuropsychologist." (Dkt. 64, Ex. 1 at 3.)  In his pretrial report, however, Dr. Morris stated

2   that the "possibility of an organic disorder should be addressed by a neuropsychologist

3   *and/or neurologist* experienced in these matters." (Dkt. 61, Ex. G at Morris Rpt. (emphasis

4   added).)  Defense counsel subsequently consulted with a neurologist, and Dr. Mayron

5   determined that Petitioner suffered from a parietal brain injury that affected his impulse

6   control.  (ROA I at 1089.)  Although Dr. Mayron asserts now that he would have advised

7   counsel to obtain neuropsychological testing if counsel had asked (Dkt. 64, Ex. 2 at 2), his

8   report did not contain such a recommendation (ROA I at 1087-89).  Counsel followed Dr.

9   Morris's advice and hired a neurologist, Dr. Mayron, who did not recommend that his results

10  be reviewed by a neuropsychologist or that Petitioner be subjected to further testing.

11  Petitioner does not claim that either of his experts were unqualified.  Therefore, counsel's

12  failure to recognize that further testing could have been helpful in assessing Petitioner's

13  mental state at the time of the offense does not constitute deficient performance.  *See Harris

14  v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) ("It is certainly within the wide range of

15  professionally competent assistance for an attorney to rely on properly selected experts.")

16  (internal quotation omitted); *see also Coleman v. Calderon*, 150 F.3d 1105, 1115 (9th Cir.)

17  (stating that "in the absence of a specific request, counsel does not have a duty to gather

18  background information which an expert needs"), *rev'd on other grounds*, 525 U.S. 141

19  (1998).

20      Petitioner's reliance on *Caro v. Calderon* is misplaced.  In *Caro*, the petitioner had been

21  examined by four experts prior to trial, including a medical doctor, psychologist, and

22  psychiatrist; none indicated that Caro suffered from a mental impairment severe enough to

23  constitute legal insanity or diminished capacity.  *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th

24  Cir. 1999).  However, counsel failed to inform these experts that Caro had been exposed to

25  an extraordinary amount of pesticides and suffered severe abuse as a child; consequently, no

26  expert testified as to the neurological effects of the chemical exposure on Caro's brain.  *Id.*

27  As set forth above, counsel in this case provided the experts with Petitioner's psychological

28  and medical history; Dr. Mayron testified to Petitioner's brain injury, which resulted in

Petitioner being impulsive and having an impaired ability to make good judgments; and Dr. Morris similarly testified to the effect of Petitioner's borderline personality disorder on his ability to conform his conduct and appreciate the difference between right and wrong. Unlike in *Caro,* there is no allegation here that counsel failed to provide his experts with significant information that would have affected their professional opinions.

Petitioner's reliance on *Bean v. Calderon* is equally unavailing. In *Bean*, the petitioner was examined by a psychiatrist and a psychologist, who both "strongly recommended further neuropsychological testing to elucidate the impact of organic brain damage on Bean's cognitive functioning." *Bean v. Calderon*, 163 F.3d 1073, 1078 (9th Cir. 1998). Here, counsel obtained testing by a neuropsychologist (Dr. Barbour) and, in response to Dr. Morris's recommendation to enlist neuropsychological or neurological testing, retained the services of a neurologist. Thus, in contrast to *Bean*, defense counsel did not fail to follow explicit recommendations from their experts.

In sum, Petitioner has not shown that the performance of his trial counsel fell below the constitutional standard set forth in *Strickland*. Counsel adequately investigated Petitioner's mental state and used the experts they had enlisted to argue that Petitioner was impulsive and that his ability to conform his conduct to the requirements of law was substantially impaired. The fact that Petitioner's habeas counsel have been able to obtain additional experts to further support this theory does not establish ineffectiveness.

Moreover, the question here is not whether Petitioner's actions at the time of the crime were compelled by brain injury or psychological disorder. Rather, the issue is whether, in light of all the circumstances at the time, defense counsel failed to meet professional standards of reasonableness by not pursuing an additional neuropsychological examination.

> That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. As we have noted before, "[i]n retrospect, one may always identify shortcomings," but perfection is not the standard of effective assistance.

*Waters v. Thomas*, 46 F.3d. 1506, 1514 (11th Cir. 1995) (quoting *Cape v. Francis*, 741 F.2d

1  1287, 1302 (11th Cir. 1984)).  Here, counsel made a significant effort, based on a reasonable

2  investigation, to capably present to the sentencing judge a sympathetic portrait of Petitioner

3  and to focus the judge's attention on reasons to spare Petitioner's life.

4      D.   <u>Prejudice Prong</u>

5      Even assuming deficient performance and entitlement to factual development, the Court

6  also concludes that Petitioner is not entitled to relief because he cannot establish prejudice

7  in light of the record as developed in state court and his newly proffered expert evidence.

8      Petitioner argues in his amended petition that, absent a neuropsychological evaluation,

9  "no expert who testified was capable of rendering a full and complete explanation of the

10  Petitioner's behavior at the time of the instant offense." (Dkt. 33 at 24.)  He asserts that with

11  "full and complete testing" counsel could have presented the following:

12
13      (a)   Petitioner suffers from Borderline Personality Disorder (BPD).  BPD is not (despite its nomenclature) a mere personality disorder; as for instance anti-social personality disorder.  BPD is a psychological disorder. . . . As a result of this mental disease, over which the Petitioner lacked any control, he suffered from an explosive impulsive aggressive episode at the time of the offense.

14

15
16      (b)  A symptom of BPD is impulsive, self-damaging behavior, including various forms of intense intoxication. . . .  The evidence shows that Petitioner was extremely intoxicated at the time of the subject offense . . . [which] would have made Petitioner more susceptible to a BPD rage episode like that which occurred at the time of the instant offense.

17

18
19      (c)  Studies of individuals with BPD reflect that it has among its predominant causes, a neglectful and abusive childhood environment.  The Petitioner's actions at the time of the instant offense were a product of a mental disease and disorder, that has its root causes in a chaotic, and abusive early environment. . . .

20

21      (d)  By age 15, the Petitioner was already showing signs of BPD, and the diagnosis (along with its precipitating chaotic family environmental causes) was confirmed in the Petitioner's early psychiatric hospitalization records which pre-date the offense by more than 20 years. . . .

22

23
24      (e)  Compounding Petitioner's mental disability in the years preceding the instant offense, he suffered from severe head injuries. . . .  These injuries have resulted in permanent damage to the parietal portion of Petitioner's brain. . . .

25
26      (f)  Prior to the instant offense, the record demonstrates no criminal record on the Petitioner's part, other than some minor alcohol related offenses, and several occurrences of marital domestic violence; both of which can conclusively be linked to his brain damage and BPD. . . .

27

28  (<i>Id.</i> at 24-26.)  As set forth in the detailed background section, counsel made all of these

- 38 -

points either in their presentence memoranda, during the presentence hearing, or in argument to the sentencing judge.

Likewise, Petitioner's new experts have not provided significant new information that was not presented at sentencing. Dr. Flynn's diagnosis of borderline personality disorder is entirely consistent with that of Dr. Morris, as is his opinion that Petitioner's ability to conform his behavior to the requirements of the law was likely impaired at the time of the offense. Dr. Morris testified that Petitioner has trouble controlling his emotions, that stress and alcohol exacerbate problems with impulse control and poor judgment, and that Petitioner is a reactive type of individual. (RT 6/18/92 at 28-29.) Based on Petitioner's history and apparent level of intoxication, Dr. Morris opined that Petitioner's capacity to appreciate the wrongfulness of his conduct was significantly impaired at the time of the crime. (RT 6/18/92 at 65.) He further opined that Petitioner's impulsivity, derived from his personality disorder, "makes it difficult for him to conform his behavior to the law." (*Id.*) The only significant difference between the opinions of Drs. Flynn and Morris is that Dr. Flynn believes Petitioner's impairment at the time of the crime was likely based on a combination of his personality disorder and organic brain deficits. Instead of eliciting similar testimony from Dr. Morris, defense counsel instead had Dr. Morris testify solely to the effects of Petitioner's personality disorder and enlisted Dr. Mayron to testify to Petitioner's impulsive behavior and impaired brain integrity resulting from his organic deficits.

Petitioner has provided new evidence of frontal lobe damage in addition to the parietal lobe injury discovered by Dr. Mayron. However, Dr. McKinzey's assessment of how this damage impacted Petitioner's behavior at the time of the offense does not differ significantly from that of Dr. Mayron. He states that frontal lobe deficits "have long been associated with impulsivity, impaired judgment, disinhibition, and sometimes uncontrollable outbursts of aggression" and "have resulted in character traits of organic origin which cause Mr. Stokley to act reflexively rather than reflectively." (Dkt. 49, Ex. 1 at 7.) During the presentence hearing, Dr. Mayron testified that Petitioner's parietal lobe injuries could have impacted his ability to understand, interpret, and respond to his environment, resulting in a decreased

1    control of impulsive behavior. (RT 6/17/92 at 12, 19.) He further explained that Petitioner's

2    head injuries caused impulsive and emotional behavior, irritability, depression, and impaired

3    ability to make good judgments and to plan ahead. (*Id.* at 33-34.) Thus, the new doctors'

4    opinions substantively encompass the totality of those offered by Drs. Morris and Maynor

5    – that Petitioner's brain and personality deficits affected his behavior, severely impairing his

6    ability to control and appreciate the wrongfulness of his conduct.

7         Moreover, the Court discounts any expert assertion regarding Petitioner's state of mind

8    at the time of the offense. Petitioner told Dr. Morris prior to trial that he had "no clear

9    memory of events associated with the death of the two girls." (Dkt. 61, Ex. G at Morris Rpt.)

10   Because Petitioner was unable to discuss the details of the offense itself, Dr. Morris stated

11   that "it was not possible to evaluate his state of mind." (*Id.*) A review of the declarations

12   from Petitioner's new experts reveals no new details from Petitioner about the offense. Dr.

13   McKinzey's conclusion that Petitioner would not have been involved in the offenses but for

14   his mental impairments is based solely on his determination that Petitioner had never

15   expressed interest in sexually molesting children and his statement to investigators that he

16   intended only to take a bath on the night of the offense. (Dkt. 49, Ex. 1 at 10.) Likewise, Dr.

17   Flynn's opinion that Petitioner's frontal lobe deficits likely affected Petitioner's impulse

18   control, emotions, and aggressive impulses at the time of the offense is based on his

19   consideration of the "literature on the link between organic frontal lobe dysfunction and

20   aggression" and the general circumstances surrounding the offense. (Dkt. 64, Ex. 3 at 3.)

21   In essence, the opinions of the new experts accord with those offered by the experts at

22   sentencing; they all theorize that Petitioner's ability to conform or appreciate the

23   wrongfulness of his conduct was significantly impaired at the time of the offense.

24        Moreover, the sentencing court found, in rejecting Petitioner's claim that his ability to

25   control his conduct was significantly impaired by a combination of psychological and

26   neuropsychological conditions, that "having difficulty with impulse control sheds little light

27   on defendant's conduct in this case." (ROA I at 1290-91.) On appeal, the Arizona Supreme

28   Court also considered Petitioner's head injuries and resulting behavioral disorders. While

1   that court "gave more mitigating weight to this element than did the trial court," the court
2   declined to find it sufficiently substantial to call for leniency in view of Petitioner's above
3   average intelligence and because "the facts show that he did not exhibit impulsive behavior
4   in the commission of the offense." *Stokley*, 182 Ariz. at 521, 898 P.2d at 470.  In addition,
5   the appellate court reasoned that Petitioner appreciated the wrongfulness of his conduct, as
6   evidenced by his statement to an investigator:  "I . . . choked 'em. . . .  There was one foot
7   moving though I knew they was brain dead but I was getting scared. . . .  And they just
8   wouldn't quit.  It was terrible." *Id.*  Consequently, the court concluded that Petitioner's
9   "prior head injuries do not show that defendant was unable to conform or appreciate the
10  wrongfulness of his conduct." *Id.*

11      After sexually assaulting at least one of the thirteen-year-old victims, Petitioner
12  strangled her with his hands, stomped on her with his feet, and stabbed her in the eye with
13  his knife.  The evidence established that the victims struggled against their attackers, and
14  Petitioner's statement to police revealed witness elimination as one of his motives in killing
15  the girls.  There is little question that the young, vulnerable victims suffered before their
16  senseless deaths and that the killings were heinous and depraved.  Given the similarity
17  between the expert evidence presented by counsel at sentencing and that proffered now by
18  habeas counsel, together with the state court's findings concerning the lack of impulsivity
19  in the commission of the crimes and the strength of the aggravating factors, this Court
20  concludes there is no reasonable probability that additional evidence of brain damage and its
21  effect on Petitioner's ability to control his impulsive behavior would have resulted in a
22  different sentence. *See Babbitt v. Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998) (finding
23  no prejudice when there is no materially new evidence that was not before the sentencer).
24  Accordingly, Petitioner is not entitled to federal habeas relief.

25                          **CERTIFICATE OF APPEALABILITY**

26      In the event Petitioner appeals from this Court's judgment, and in the interests of
27  conserving scarce Criminal Justice Act funds that might be consumed drafting an application
28  for a certificate of appealability to this Court, the Court on its own initiative has evaluated

1    the claims within the Amended Petition for suitability for the issuance of a certificate of

2    appealability.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

3        Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

4    is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

5    certificate of appealability (COA) or state the reasons why such a certificate should not issue.

6    Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made

7    a substantial showing of the denial of a constitutional right."  With respect to claims rejected

8    on the merits, a petitioner "must demonstrate that reasonable jurists would find the district

9    court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529

10   U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4 (1983)).  For

11   procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the

12   petition states a valid claim of the denial of a constitutional right and (2) whether the court's

13   procedural ruling was correct.  *Id.*

14       The Court finds that reasonable jurists could debate its resolution of Claim A-1.

15   Therefore, the Court grants a certificate of appealability as to this claim.  For the reasons

16   stated in this order, as well as the Court's order of August 31, 2006 (Dkt. 70), the Court

17   declines to issue a certificate of appealability for Petitioner's remaining claims and

18   procedural issues.

19                                        **CONCLUSION**

20       For the reasons set forth above, Petitioner is not entitled to habeas relief.  The Court

21   further finds that evidentiary development is neither warranted nor required.

22       Accordingly,

23       **IT IS HEREBY ORDERED** that Petitioner's Second Amended Petition for Writ of

24   Habeas Corpus (Dkt. 33) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

25       **IT IS FURTHER ORDERED** that the stay of execution entered on July 15, 1998 (Dkt.

26   2) is **VACATED**.

27       **IT IS FURTHER ORDERED** granting a Certificate of Appealability as to the

28   following issue:

                                             - 42 -

Whether counsel rendered ineffective assistance at sentencing by failing to investigate and present evidence concerning Petitioner's mental state at the time of the offense.

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 17th day of March, 2009.

**Copies Distributed to**

**Rachelle M. Resnick**

FRANK R. ZAPATA
United States District Judge

- 43 -